Blaine A. GILBERT et al.

v.

**WEBSTER PARISH SCHOOL BOARD et al.**

Civ. A. No. 11501.

United States District Court,
W. D. Louisiana,
Shreveport District.

July 19, 1974.

9

Arthur G. Thompson, Shreveport, La., for plaintiffs.

Charles A. Marvin, Webster Parish District Atty., Minden, La., John F. Ward, Jr., Baton Rouge, La., for defendants.

James J. Thornton, Jr., Johnston, Thornton & Pringle, Shreveport, La., for intervenors.

## I.

## BACKGROUND

STAGG, District Judge.

This case originated December 8, 1965, when a petition to desegregate the Webster Parish schools was filed. Between the end of 1965 and the beginning of 1970, the Court issued several decrees directed to the School Board in an attempt to eliminate the dual system of education in Webster Parish. On February 2, 1970, this Court issued an order delineating how the Webster Parish School Board was to achieve desegregation. The plan contained in the 1970 order utilized both pairing and zoning as desegregation tools.

At the end of the 1972 school year, it was apparent that racially identifiable schools continued to persist in the Webster Parish school system. As a result of the existence of such schools, the plaintiffs filed a petition for further relief on June 16, 1972. On August 28, 1973, this Court entered a supplemental order clarifying the February 2, 1970, order.

On January 9, 1974, this Court created a Bi-Racial Citizens Committee. This Committee was ordered to devise a plan for desegregation and submit the plan to the Court and to the Webster Parish School Board. The order contemplated that the plan would be submitted to the School Board for its consideration and response. In that same order, the School Board was ordered either to submit a partial or total adoption of the Committee's plan, or one of its own. It was further ordered that the School Board submit a faculty desegre-

gation plan in full compliance with *Singleton.*

A majority of the Bi-Racial Committee has submitted a plan (Joint Exhibit 1), a minority of the Bi-Racial Committee has submitted a plan (Joint Exhibit 2) and the Webster Parish School Board has submitted a plan (Joint Exhibit 3). Two citizens intervened as defendants and submitted yet another plan (Joint Exhibit 4), only for the schools in the Minden attendance district.

Prior to the hearing in this matter on July 1, 1974, the Court inspected every school facility in Webster Parish except Shongaloo and Union Elementary in Doyline. (There is no controversy concerning these two facilities.) It was felt that the locations and physical plants were, to a considerable degree, a part of the problems presented by the petition for further relief.

With the exception of the Minden attendance district, all plans submitted were in compliance with the Supreme Court's mandate to achieve a system-wide unitary status. For reasons which will be outlined below, this Court has chosen to approve the School Board's plan for the attendance districts other than Minden.

Webster Parish encompasses approximately 620 square miles. It is roughly rectangular in shape, some 42 miles from its northern boundary to its southern boundary, and approximately 15 miles wide. Within the Parish, there are seven attendance districts, each being a separate bonding district. Within these districts, there are 23 schools. For the 1973–74 school year, there were 5,989 white students and 4,026 black students. The teachers and principals numbered 340 whites and 197 blacks.[1]

In the six attendance districts outside Minden, there were only slight variations between the plan proposed by the Bi-Racial Committee and the plan pro-posed by the Webster Parish School Board. These variations involved a difference of opinion on the assignment of grade levels to particular school facilities.

This Court, in its approach to a resolution of the conflicting plans, is guided by the following language from the Supreme Court's decision in Green: [2]

"The obligation of the district courts, as it always has been, is to assess the effectiveness of a proposed plan in achieving desegregation. There is no universal answer to complex problems of desegregation; there is obviously no one plan that will do the job in every case. The matter must be assessed in light of the circumstances present and the options available in each instance. * * * "

## II.

### A UNITARY SYSTEM HAS BEEN ACHIEVED IN FOUR OF THE WEBSTER PARISH ATTENDANCE DISTRICTS.

Preliminary to a discussion of the merits of the various plans before the Court, it should be noted that the Webster Parish School Board plan and the Bi-Racial Committee plan are the only plans concerned with the attendance districts outside of Minden. There is no controversy with regard to the Sarepta, Cotton Valley and Shongaloo attendance districts, therefore, discussion of these will be minimal. Full desegregation in these attendance districts has been achieved. Schools in these attendance districts have been "paired", the system in these attendance districts thereby becoming a unitary system as mandated by Swann v. Charlotte-Mecklenburg Board of Education, 1971, 402 U.S. 1, 91 S.Ct. 1267, 28 L.Ed.2d 554. (See Appendix B–2.) The Webster Parish School Board and the Bi-Racial Committee join in submitting the plan for these districts. The Court approves the joint

---

1. See Appendix B–1 for a compilation of student and teacher population for the years 1961 to 1973.

2. Green et al. v. County School Board of New Kent County, Virginia et al., 391 U.S. 430, 88 S.Ct. 1689, 20 L.Ed.2d 716.

submission. It is further noted that the School Board has amended its proposed plan for the Doyline attendance district. Schools in the Doyline attendance district will be paired with K–5 at Union Elementary and 6–12 at Doyline. This amendment has been brought about by a shifting of a number of students from the Doyline attendance district to the Minden attendance district.[3] The end result of this change will be a unitary system acceptable to plaintiffs and defendants.

### III.

### THE WEBSTER PARISH SCHOOL BOARD PLAN FOR SPRINGHILL IS THE BEST PLAN FOR THAT ATTENDANCE DISTRICT.

With the exception of the Minden attendance district, the Springhill and the Sibley-Central-Dubberly-Heflin districts are the only remaining areas of dispute. Only two plans, the School Board plan and the Committee's majority plan are addressed to these attendance districts. Both plans would achieve the same degree of integration. There is only a difference of opinion as to which grades should be assigned to which facilities.

The Board's plan for the Springhill district would place grades 9–12 in the Springhill High School, grades 7–8 in the Springhill Jr. High facility, grades 5–6 in the Brown School, grades 3–4 in the Howell School, and grades K–2 in Browning.

The Bi-Racial Committee's plan would differ in that grades 10–12 would be placed in the Springhill High School, grades 8–9 would be placed in Brown, grades 6–7 would be placed in the

Springhill Jr. High facility, and grades 3–5 would be placed in the Howell School.

The major difference between the two plans concerns the relative roles of the Brown School and the Springhill Jr. High School. The School Board has chosen the Springhill Jr. High School to house grades 8–9, because it is contiguous to the high school complex, and would lend itself to joint use of the athletic facilities, counselling personnel and teaching personnel, as well as to the continuation of the L.A.P. instructional program.[4] The School Board noted also that the physical plant at Springhill Jr. High would better lend itself to serving grades 7–8.

The Bi-Racial Committee countered that Brown, an ex-high school facility, is physically just as well equipped and should serve grades 8–9. The Committee emphasized, "The most persuasive reasons for allowing Brown and Central to be utilized as recommended by the Citizens Committee, and without changing their names, is the sociological harm done to the black children when they see every school steeped in black culture downgraded or destroyed, while schools steeped in white culture flurish (sic) and prosper." While this reasoning may be meritorious, the facts compel the adoption of the Board's plan. The testimony by the Webster Parish School Board superintendent was to the effect that physically, the Board plan was most feasible. This was substantiated by this Court's observations of the school facilities in question. Moreover, implementation of the Committee plan would make impractical the innovative methods of

---

3. In the Doyline attendance and bonding district, students living in the Dixie Inn and Lucky areas north of Highway 80 and west of Dorcheat Bayou having attended Minden schools since the 1920's will be allowed to continue attending Minden schools. The school assignment of these students will be discussed under Part VI of this opinion.

4. The Learning Activity Packet program at Springhill High School utilizes a method of instruction which allows students to pro-

gress at varying rates. For example, in a General Science course, there may be 12 packets. A quick student may finish these packets in six months and move into Biology. A slower student may require ten months; however, he does not fail the course and start over. He continues the unfinished packet with the next semester or term. This results in some students being on a ninth-grade level in some subject areas, and on a tenth-grade level in other subject areas.

education now being utilized in Springhill High School. The separation of grade 9 from grades 10–12 would greatly reduce the effectiveness and the quality of the program. Again, while the Committee's plan and reasoning may have some philosophical merit, it is not the more acceptable plan.

We are commanded by the Appellate Courts to view schools as schools—neither white nor black. That a facility was designed, sited and built to accommodate children living in a black or white area cannot now lend to the bricks and mortar an aura of black or white cultural attractiveness. The Supreme Court said:

> " * * * The elimination of racial discrimination in public schools is a large task and one that should not be retarded by efforts to achieve *broader purposes* lying beyond the jurisdiction of school authorities. One vehicle can carry only a limited amount of baggage. * * * " (Emphasis added.) *Swann,* supra, 402 U.S. 1 at 22, 91 S. Ct. 1279.

For reasons outlined above, this Court approves the Board plan and orders its adoption.

## IV.

THE BOARD PROPOSAL THAT THE SIBLEY SCHOOL SERVE THE SIBLEY - CENTRAL - DUBBERLY - HEFLIN AREA AS A HIGH SCHOOL IS THE MOST LOGICAL PROPOSAL.

In the Sibley-Central-Dubberly-Heflin attendance district, the difference in the Committee plan and the School Board plan is on the same plane as the disagreement in Springhill. There is no dispute about elementary schools; both parties agree that the Heflin and Dubberly schools will house K–5 in their respective zones. (See Joint Exhibits 1 and 3.) The differences arise with respect to the high school and junior high school. The Citizens Committee proffers the same philosophical reasoning for choosing the formerly black school for the high school, but in addition argues that it is also physically superior. The School Board points out that the Sibley School is located in the population center of the attendance district and argues that Sibley is the physically superior plant.

The Court visited both plants. Each has attributes the other lacks. The Sibley plant consists of both older and newer structures and has the advantage of an auditorium, a superior gymnasium and sufficient grounds for athletic facilities. Central consists, mainly, of a new structure (1966) built on the site of an old school and has agri-farm facilities and a language laboratory (little used). The Central School, however, has three distinct disadvantages: 1) it is far removed from the area's population center—in fact it is remote; 2) its grounds are extremely small, with no prospect for expansion; and 3) its gymnasium is an old, wooden structure located across the highway from the school grounds. It should be noted that the agri-farm facility and the language lab at Central are movable, whereas the advantages possessed by Sibley are not. The school superintendent testified that the agri-farm facilities and the language lab would be moved to Sibley to make for a more complete facility. The Court takes notice of the fact that it is more important for a high school to be located near the area's population center than a junior high, because—due to the very nature of a high school—it has more need for the services of local government and the local social and business community. The superintendent testified that it was more important for a high school to be near police and fire services; again, because of the nature of a high school, the potential for having to use these municipal services is much greater.

Each school has adequate lunchroom facilities, adequate library facilities and a gym (except as noted at Central). By contrast, Sibley has an excellent auditorium, gym and baseball facilities. The

choice of the Board for the high school to be at Sibley and the junior high school at Central was based on non-racial, education-related reasons. See Mims v. Duval County School Board, 5th Cir. 1971, 447 F.2d 1330.

The plaintiff has postulated the argument that the degrading of black schools is contra to the spirit of Brown I. Brown v. Board of Education of Topeka, 1954, 347 U.S. 483, 74 S.Ct. 686, 98 L. Ed. 873. Clearly, if schools were chosen on the basis of their past racial identity, such a choice would be unacceptable. The school board has demonstrated, however, that their determinations were based on objective criteria and the goal was to assign students to the facility which could best accommodate their numbers and grade levels. What the choices have confirmed is that the supposedly separate, but equal, facilities of the past decades were not, in fact, equal.

For the above reasons, therefore, the Court approves and adopts the Webster Parish School Board plan for the Sibley-Central-Dubberly-Heflin district.

## V.

NO PLAN FOR FURTHER DESEGREGATION OF THE MINDEN ATTENDANCE DISTRICT IS FULLY ACCEPTABLE TO THE COURT.

In the Minden attendance district, there exists the highest degree of segregation in the Parish, and the greatest amount of disagreement how to eliminate it. During the 1972–73 school year, several Minden schools were all-black. These were Moore and Jones Elementary, Phillips Junior High and Webster High. There were, as was noted earlier, four plans for the Court's attention, relative to the Minden attendance district.

The Committee plan (see Joint Exhibit 1) and the School Board plan (see Joint Exhibit 3) call for pairing grades 6–12. Grade 6 for the entire Minden district would be assigned to Phillips, grade 7 to Lowe, grades 8–9 to Webster and grades 10–12 to Minden High School.

For grades K–6, the plans are disparate and irreconcilable. The School Board uses zoning for each of the five elementary schools. The zones are similar to those established in 1970, except the new zones are extended beyond the Minden City Limits out to the boundaries of the Minden attendance district. These zones do not offer a significant promise of improvement over the similar zones which yielded two all-black elementary schools. The Committee, on the other hand, extends pairing to the elementary grades. The Committee plan does utilize an approved tool, pairing, but uses it rather radically. Students from the western zones of Minden would attend *six* different schools in twelve years, and students in the eastern zone of Minden would attend *seven* different schools in twelve years. While this plan would achieve an otherwise desirable result (a similar ratio of whites and blacks would exist in all schools), the effect of so many changes in so few years would devastate the average student. The only witness qualified as an expert in educational matters who appeared at the hearing on this matter testified that the Committee's plan would create a high degree of insecurity in the younger students and would reduce the effectiveness of the educational process in general. The Court notes that pairing has been proffered and approved as the vehicle used to desegregate schools elsewhere in the parish, but pairing in those districts resulted in a maximum of four changes in twelve years (Springhill District). While numerically this plan looks good on paper, it was the opinion of the educational expert who testified at the hearing, and it is the finding of this Court, that the effect of so many changes would be detrimental to the children's psychological and educational well being.

The Bi-Racial Committee was not in total agreement as to the proper course for changing to a unitary system. A

minority group of Committee members submitted an alternate plan. Their plan, like the majority plan, required a student to transfer as many as seven times in twelve years. Again, as the testimony by the expert at the hearing established, this is educationally unsound. Therefore, for the same reasons that the majority plan was rejected, the minority plan is rejected.

■ The plan submitted by the intervenors (Joint Exhibit 4) is unacceptable to the Court. The intervenors' plan proposes the maintenance of two high schools in Minden. Proposed attendance figures show that Minden High School would be 72 per cent white under the intervenors' plan, and Webster High School would be 73 per cent black. Two junior highs would be maintained—Phillips, 75 per cent black and Lowe, 61 per cent white. The elementary schools would be assigned students from their respective zones. (See Appendix 2.) This would result in the following proposed ratios:

Harper — 21 per cent black, 79 per cent white
Richardson — 32 per cent black, 68 per cent white
Stewart — 58 per cent black, 42 per cent white
Jones — 94 per cent black, 6 per cent white

Obviously, from the attendance figures, above, the intervenors' plan would fail to convert the Minden attendance district system into a unitary one, as is required by Swann v. Charlotte-Mecklenburg Board of Education, supra, 402 U.S. 1, 91 S.Ct. 1267, 28 L.Ed. 554.

Granted, the intervenors' plan would minimize the number of changes a student would have to make in twelve years and would perpetuate the neighborhood school, but the plan fails to convert the Minden system into a unitary one.

It is noted that the intervenors rely heavily on the language in Swann as follows:

" * * * If we were to read the holding of the District Court to require, as a matter of substantive constitutional right, any particular degree of racial balance or mixing, that approach would be disapproved and we would be obliged to reverse. The constitutional command to desegretate schools does not mean that every school in every community must always reflect the racial composition of the school system as a whole.

* * * * * *

"The record in this case reveals the familiar phenomenon that in metropolitan areas minority groups are often found concentrated in one part of the city. In some circumstances certain schools may remain all or largely of one race until new schools can be provided or neighborhood patterns change. Schools all or predominately of one race in a district of mixed population will require close scrutiny to determine that school assignments are not part of state-enforced segregation.

"In light of the above, it should be clear that the existence of some small number of one-race, or virtually one-race, schools within a district is not in and of itself the mark of a system that still practices segregation by law. * * *" Swann v. Charlotte-Mecklenburg Board of Education, supra, 402 U.S. 1, at 24, 25–26, 91 S.Ct. 1267, at 1280–1281.

The intervenors seek to justify the plan submitted by them by adopting the above reasoning. A reading of the entire opinion, however, will indicate that the Swann Court was referring to a situation where the system generally represented a unitary one, but one inaccessible inner city school remained predominately black. In Minden there is no "inner city", though there are areas of black population concentration which must be dealt with.

The Fifth Circuit, in Boykins v. Fairfield Board of Education, 5th Cir. 1972, 457 F.2d 1091, addressed itself to the same language from Swann urged by the intervenors. In that case, the Court rejected the argument that a small town, similar in size to Minden, was the type of metropolitan area the Supreme Court envisioned in Swann.

" * * * A school system with fewer than two thousand elementary school students, encompassing an area of only three square miles is not the type of 'metropolitan area' the Supreme Court envisioned when, in *Swann,* it said that one-race schools may, in some circumstances, be acceptable because of segregated housing patterns. This Court has spoken to the issue of the continued existence of one-race schools.

> 'In the conversion from dual school systems based on race to unitary school systems, the continued existence of all-black or virtually all-black schools is unacceptable where reasonable alternatives exist. And it is clear that one acceptable way to achieve reasonable alternatives is by pairing schools. The tenor of our decisions is unmistakable: where all-black or virtually all-black schools remain under a zoning plan, but it is practicable to desegregate some or all of the black schools by using the tool of pairing, the tool must be used.' (Citations omitted.)

We do not read Swann as undermining our previous decisions in any way.

"The appellees rely on the fact that the Fairfield zone lines were drawn so as to integrate the schools. The continued existence of Robinson as a one-race school was caused, they argue, by the departure from the school system of the white students who were to attend Robinson under the plan. In other words, because Fairfield was integrated on paper, the appellees would have us consider the abolition of the dual system to be complete and regard any current segregation as de facto rather than de jure. * * * Fairfield has not yet eliminated all vestiges of the dual system. If and when this is accomplished, the appellees' argument may be appropriate. Until this goal is achieved, affirmative steps must be taken to discontinue the operation of Robinson as a one-race school." 457 F.2d at 1095–1096.

The testimony by the superintendent of schools was to the effect that any plan that would place more than 50 per cent black students in a school would, in effect, make that school an all-black school. Past experiences in Webster Parish has proven that the plan submitted by the intervenors would result in a completely segregated system.

Moreover, the plan submitted by the intervenors, even if it were to achieve the results predicted by the intervenors, would not attain the objective mandated by the Supreme Court. That Court in *Swann,* said:

> "The objective today remains to eliminate from the public schools all vestiges of state-imposed segregation. Segregation was the evil struck down by *Brown I.* as contrary to the equal protection guarantees of the Constitution. That was the violation sought to be corrected by the remedial measures of *Brown II.* That was the basis for the holding in *Green* that school authorities are 'clearly charged with the affirmative duty to take whatever steps might be necessary to convert to a unitary system in which racial discrimination would be eliminated root and branch.' 391 U.S., at 437–438, 88 S.Ct., at 1964." Swann v. Charlotte-Mecklenburg Board of Education, supra, 402 U.S. at 15, 91 S.Ct., at 1275.

The plan submitted by the intervenors would retain the formerly black schools as racially identifiable black institutions. This is clearly objectionable and the intervenors' plan is rejected.

This Court approves the plan for grades 6–12 as suggested by both the Citizens Committee and the School Board, as outlined at the beginning of this Part V.

None of the four plans for the further desegregation of the elementary schools of the Minden attendance district is acceptable to the Court.

## VI.

THE COURT'S PLAN FOR DE-SEGREGATION OF ELEMENTARY SCHOOLS IN THE MINDEN AT-TENDANCE DISTRICT REMEDIES CONSTITUTIONAL DEFECTS.

After an extended period of study and reflection on past decisions, reviewing the voluminous file in this case, reading recent filings with pages of attendance figures and maps and an on-the-ground inspection of every school in Minden—there is little wonder the Court is faced with the dilemma of a proper course of action. The problem looms largest when the rows and columns of numbers are translated into visions of small children, the natural treasures of concerned parents.

This judge is very familiar with the City of Minden and its people. One need spend but a short time there to learn that this is a small but sophisticated community. The past throes of desegregation have produced only a single private school in response to the upheaval of the educational system.

The plan prepared by the Court is a synthesis of the several plans and, for that reason alone, may not find favor with anyone. It will meet the requirements of the Appellate Courts and, hopefully, will provide the community with a period of stable and dependable school arrangement.

There were five elementary schools operating in the Minden attendance district during the 1973–1974 school year. Three of the elementary schools were predominently white—two were all black. The only plan proposed that eliminated segregation, the Citizens Committee plan, was educationally unsound. (See Part V., above.)

The plan submitted by the School Board appears educationally sound, but constitutionally defective.

This Court is of the opinion, however, that the constitutional infirmities of the Board's plan can be remedied by amending the Minden elementary school attendance zones and the change of status of one elementary school.

The Moore school is an isolated facility which is no longer needed as an elementary school in Minden. The Court's plan is that this school be transformed into a much-needed school-away-from-school. Testimony by Superintendent Williams described the usefulness of such a facility for furthering the special educational needs of students drawn from all of the school districts in the Parish. Students with behavior problems, pregnant girls and those with other adjustment problems would be the objects of a remedial education program designed for their benefit. Those students living in the former Moore zone would be included in an enlarged Stewart zone. The other elementary schools would house the students in their respective zones with the exception of Jones Elementary which would also house the elementary students from the area west of Minden north of Highway 80, as described in Footnote 3 above, in addition to the students living in the Jones school zone. Portions of the former Jones zone have been transferred to the Richardson and Harper zones which, incidentally, serves to reduce the present overcrowding at Jones and increases the black attendance in the other schools in the district.

The net effect of these zone changes and the use of a satellite zone for Jones would place 280 whites and 171 blacks in Harper school, 146 whites and 368 blacks in Jones, 355 whites and 95 blacks in Richardson, and 264 whites and 271 blacks in Stewart school.[5]

As was outlined above, the plan submitted by the School Board was acceptable with the exception of the portion dealing with the elementary schools in

5. These changes should be noted in comparison with the school population figures shown on Appendix D, Page 2.

the Minden attendance district. The Court has amended the elementary zones in the Minden district to remedy the Constitutional defects. As the amended plan now provides, there will be no all-black schools in Webster Parish, and no elementary schools with disproportionate majorities. The objective of this action was to eliminate " * * * all vestiges of state-imposed segregation." Swann v. Charlotte-Mecklenburg Board of Education, supra, 402 U.S. at 15, 91 S.Ct. at 1275. The plan adopted by this Court accomplishes that objective.

## VII.

THE SCHOOL BOARD MUST ACT TO FURTHER COMPLY WITH SINGLETON'S MANDATES RELATIVE TO PERSONNEL.

The changes that will result from the student assignments outlined above will necessarily result in numerous school personnel transfers and demotions. The School Board's proposal for handling the faculty changes is satisfactory in part and deficient in part.

The School Board outlined objective criteria to be used in transferring teachers (Appendix B–4), but neglected to address themselves to the demotion of school personnel. In this regard, the School Board will be required to formulate "nonracial objective criteria" as is mandated by Singleton v. Jackson Municipal Separate School District, 5th Cir. 1970, 419 F.2d 1211 at 1218.

This Court, on January 9, 1974, ordered the defendant to implement the requirements and provisions of Singleton by the 1974–1975 school year. What has been submitted cannot be deemed sufficient.

In keeping with the order of January 9, 1974, however, the school will be ordered to prepare and file in these proceedings nonracial objective criteria as mandated by Singleton. The Singleton Court said:

"If there is to be a reduction in the number of principals, teachers, teacher-aides, or other professional staff employed by the school district which will result in a dismissal or demotion of any such staff members, the staff member to be dismissed or demoted must be selected on the basis of objective and reasonable non-discriminatory standards from among all the staff of the school district. In addition if there is any such dismissal or demotion, no staff vacancy may be filled through recruitment of a person of a race, color, or national origin different from that of the individual dismissed or demoted, until each displaced staff member who is qualified has had an opportunity to fill the vacancy and has failed to accept an offer to do so.

"Prior to such a reduction, the school board will develop or require the development of nonracial objective criteria to be used in selecting the staff member who is to be dismissed or demoted. These criteria shall be available for public inspection and shall be retained by the school district. The school district also shall record and preserve the evaluation of staff members under the criteria. Such evaluation shall be made available upon request to the dismissed or demoted employee.

" 'Demotion' as used above includes any reassignment (1) under which the staff member receives less pay or has less responsibility than under the assignment he held previously, (2) which requires a lesser degree of skill than did the assignment he held previously, or (3) under which the staff member is asked to teach a subject or grade other than one for which he is certified or for which he has had substantial experience within a reasonably current period. In general and depending upon the subject matter involved, five years is such a reasonable period." Singleton v. Jackson, supra, 419 F.2d 1211, at page 1218.

Clearly, *Singleton* calls for more than has been done.

■ *Singleton* also made it clear that with regard to staff who work with children, and staff who work on the administrative level, the Boards shall hire, assign, promote, pay, demote, dismiss and otherwise treat personnel without regard to race, color or national origin. The plaintiff alleged discrimination on the part of the School Board relative to administrative personnel. The testimony by the school superintendent established that, although the administrative staff had a minority of blacks, its personnel policies involving the staff are non-discriminatory. No allegation was made that the board hired, assigned, promoted, paid, demoted, dismissed or in any manner treated any black in a discriminatory manner. The superintendent testified that all applications for administrative positions were treated in a non-discriminatory manner and pointed out that two of the four assistant superintendents were black. Absent some showing that the Board denied an administrative position to a black or another minority group member, no burden is on the School Board except to comply with *Singleton* which from the testimony the Court can conclude it has.

It is noted that the School Board, since this Court's order of February 2, 1970, has maintained a system-wide faculty ratio of approximately 65 per cent white to 36 per cent black in each school. (See Appendix B–1, Page 1.) This is in keeping with the mandate of Singleton. Moreover, the superintendent testified at the hearing that as a result of this year's retirements, the projected ratio for the 1974–1975 school year will result in greater percentage of black teachers in the Webster Parish School system. Insofar as ratios of white to black staff members working directly with children is concerned, the Board has complied with *Singleton's* mandate that " * * * the ratio of Negro to white teachers in each school, and the ratio of other staff in each, are substantially the same as each such ratio is to the teachers and other staff, respectively, in the entire school system." 419 F.2d at 1218.

## VIII.

## THERE IS NO EVIDENCE TO INDICATE DISCRIMINATION AGAINST BLACKS IN THE AREA OF DISCIPLINE OR EXTRACURRICULAR ACTIVITIES.

■ The plaintiff has alleged Board discrimination in the areas of discipline and extracurricular activities. The evidence at the hearing did not sustain the contention in plaintiff's petition that the Board discriminated against black students in the area of discipline nor did the evidence show discrimination by school authorities in the area of extracurricular activities.

In Appendix B–5, there is listed, by schools, the suspension and expulsions for the period from September 1, 1972, to February 1, 1973. In Appendix B–6, there is listed by schools and by causes, the suspension and expulsions for the period from September, 1973 to May, 1974. These statistics clearly show that no pattern of racially motivated student disciplinary action exists in Webster Parish Schools.

In his testimony, the school superintendent stated that the Board's policy required that all school functions be held in places where no student would be discriminated against. He further testified that the only bar to participation in extracurricular activities was the failure to maintain a satisfactory grade average.

## IX.

## THE FUNCTION OF THE BI-RACIAL CITIZENS COMMITTEE NOW BEING FULFILLED, THE COMMITTEE IS HEREBY DISCHARGED.

By its order of January 9, 1974, this Court appointed a Bi-Racial Citizens Committee with the objective being to assist and to advise the School Board

with regard to the transition which is the subject of this action. The Committee succeeded in part and failed in part. The Committee never met with the School Board or worked with it in any manner. The Committee did work diligently to formulate its plan. Unfortunately a division occurred denying a desirable unanimity. The majority plan was submitted by the five blacks on the Committee, joined by the white representative from Springhill. The minority plan was submitted by the dissenting white Committee members. The Court here expresses its appreciation to the Committee for the efforts of its members. The essential purpose for the formation of the Committee being accomplished with the publication of this opinion, the Committee is now discharged.

## X.

## CONCLUSION

In 1968, Chief Judge John Brown of this circuit wrote:

" * * * The Judiciary is not, cannot be, the universal salvor. In saying this we believe we express for the District Judge—indeed all of them—a like hope that the schools soon run without orders of any kind from Courts, Federal or State." United States v. Bessemer et al, 5th Cir. 1968, 396 F.2d 44.

Chief Justice Burger of the United States Supreme Court said:

" * * * Neither school authorities nor district courts are constitutionally required to make year-by-year adjustments of the racial composition of student bodies once the affirmative duty to desegregate has been accomplished and racial discrimination through official action is eliminated from the system. This does not mean that federal courts are without power to deal with future problems; but in the absence of a showing that either the school authorities or some other agen-

cy of the State has deliberately attempted to fix or alter demographic patterns to affect the racial composition of the schools, further intervention by a district court should not be necessary." *Swann*, supra, 402 U.S. at 32, 91 S.Ct. at 1284.

For this limited reason, this Court will retain jurisdiction of this matter.

Note: In the body of this opinion there are references to Joint Exhibits which were filed in evidence at the hearing on July 1, 1974. Because of the bulk involved (101 pages), these documents are included herein by reference to these Exhibits in the record of this suit.

## ORDER

All previous orders of this Court with respect to the operation of the Webster Parish School System are hereby amended, insofar as they are in conflict with the following.

I. The school attendance district boundary lines are those set forth in Appendix A.

II. The zone lines for elementary schools within the Minden attendance district are those shown on the attached map and in Appendix A.

III. The plan submitted by the Webster Parish School Board shall be implemented as to all attendance districts except the Minden attendance district.

IV. In the Minden attendance district, all students in grades 10–12 shall attend Minden High School, all students in grades 8–9 shall attend Webster Jr. High School, all students in grade 7 will attend Lowe School, all students in grade 6 will attend Phillips School.

V. Elementary students (grades K–5) in the Minden attendance Dis-

trict will attend the elementary schools in their respective zones.

VI. Students living in the area described generally as being north of U. S. Highway 80, west of Dorcheat Bayou and south of the Cotton Valley attendance district will attend the schools in the Minden attendance district. (See Jones zone, Appendix A.)

VII. The following portion of Judge Scott's order of August 28, 1973, is made part of this order:

"IT IS FURTHER ORDERED that no transfers from one school attendance zone to another shall be allowed except in those instances where a student is subjected to a hardship to be determined in accordance with the following principles:

"(1) The hardship must be one to which the student and not the parent is subjected, and shall not be a mere inconvenience to the student or the parent;

"(2) No transfers shall be allowed because one or both parents are employed and away from home except in grades K through three, and then only for good cause shown in writing as in the case of hardships hereafter referred to;

"(3) There shall be no transfers allowed for curriculum purposes;

"(4) In cases where it is demonstrated in writing to the satisfaction of (a) the principal of the transferor school, (b) the principal of the transferee school and (c) the Superintendent or his delegate, that either a physical risk, a learning adjustment problem, or a severe disciplinary problem may be alleviated, a transfer from one school to another may be allowed, subject to the approval or ratification of the Board. Applicants whose requests for transfer are denied shall have the right to appeal to the school board which shall provide for a full hearing on appeal, all subject to review by this court upon good cause being shown. Copies of all requests for hardship transfer and the disposition thereof shall be periodically and timely submitted to the Attorney for Plaintiffs for his information.

"(5) 'Majority to minority' transfers as previously recognized and permitted by the court and the plan of integration filed herein, shall be allowed by the board. * * *'"

VIII. Principals and supervisory personnel in the Webster Parish School system shall strictly enforce the attendance zones established by the Court.

IX. On October 15, 1974, and on March 15, 1975, and on the same dates annually thereafter, until further order of this Court, Webster Parish School Board shall file with the Clerk of this Court a report showing the number of students by race enrolled in each school in Webster Parish, the number of teachers by race employed by the School Board and the number of teachers by race in each school in the Parish. The report shall also include a full description of majority to minority transfers and any other transfers between attendance districts.

X. The School Board shall formulate criteria for demoting personnel as is mandated by *Singleton*. These criteria shall be filed with the Court within ten (10) days.

XI. The provisions of this order are to be implemented by the start of the 1974–1975 school year.

DESCRIPTION OF SCHOOL ATTENDANCE ZONES
WEBSTER PARISH SCHOOL SYSTEM
EFFECTIVE SCHOOL YEAR 1974-75

Springhill School Attendance Zone:

Begin at the intersection of North fork of
Cypress Creek and the Arkansas-Louisiana state
line in Section 5, Township 23 North, Range 9
West; thence West on state line to Bayou
Bodcau; thence Southerly along Bayou Bodcau
to Township line 23 North; thence East on
township line to Bayou Dorcheat; Northerly
along Bayou Dorcheat to its intersection with
Cypress Creek in Section 34, Township 23
North, Range 10 West; thence Northeasterly
along Cypress Creek to point of beginning.

Sarepta School Attendance Zone:

Begin at the intersection of Township line
23 North and Bayou Bodcau; thence Southerly
on Bayou Bodcau to North line of Section 36,
Township 22 North, Range 11 West; thence East
on section lines to Bayou Dorcheat; thence
Northerly on Bayou Dorcheat to its intersection
with Township line 23 North; thence West on
Township line to point of beginning.

Cotton Valley School Attendance Zone:

Begin at parish boundary at Northwest corner
of fractional Section 36, Township 22 North,
Range 11 West; thence run Southerly on
parish boundary to Northwest corner of Section
31, Township 20 North, Range 10 West; thence
East on section lines to Bayou Dorcheat; thence
Northerly along Bayou Dorcheat to its intersection
with the North line of Section 35, Township 22
North, Range 10 West; thence West on section lines
to point of beginning.

Shongaloo School Attendance Zone:

Begin at intersection of North fork of Cypress
Creek and Arkansas-Louisiana state line in
Section 5, Township 23 North, Range 9 West; thence
run East on state line to East line of Webster
Parish; thence run Southerly on parish boundary
to Township line 21 North; thence run West to
Bayou Dorcheat; thence run Northerly along Bayou
Dorcheat to its intersection with Cypress Creek
in Section 34, Township 23 North, Range 10 West;
thence Northeasterly along Cypress Creek to point
of beginning.

Doyline School Attendance Zone:

> Begin at Southwest corner of Webster Parish; thence
> East on parish boundary to its intersection
> with Bayou Dorcheat (Lake Bistineau); thence
> Northerly along Bayou Dorcheat to Southeast corner
> of Section 6, Township 18 North, Range 9 West;
> thence West to Southwest corner of Section 6,
> Township 18 North, Range 9 West; thence North
> to intersection with Interstate Highway 20; thence
> West on I-20 to its intersection with the West
> line of Section 3, Township 18 North, Range 10 West;
> thence North on section lines to Southeast corner
> of Section 16, Township 19 North, Range 10 West;
> thence Northwest to Northwest corner of Section
> 16, Township 19 North, Range 10 West; thence North
> to its intersection with Highway 18; thence West
> to parish boundary; thence South on parish boundary
> to point of beginning.

### SIBLEY SCHOOL ATTENDANCE ZONE

> Begin at intersection of Bayou Dorcheat
> (Lake Bistineau) on South parish boundary; thence
> North along Bayou Dorcheat to its intersection
> with North line of Section 8, Township 18 North,
> Range 9 West; thence East on section lines to
> Northeast corner of Northwest Quarter of Northwest
> Quarter, Section 10, Township 18 North, Range 9
> West; thence South to North line of South half
> (S½) of Section 10, Township 18 North, Range 9
> West; thence East to West line of Section 12,
> Township 18 North, Range 9 West; thence North to
> Northwest corner of Section 1, Township 18 North,
> Range 9 West; thence East to parish boundary;
> thence Southerly and Westerly along parish boundary
> to point of beginning.

Dubberly Elementary Zone in Sibley Attendance Zone:

> That area of Sibley Attendance Zone above described
> lying North and East of a line beginning where
> Illinois-Central Railroad intersects Bayou Dorcheat,
> running Easterly along railroad to Louisiana &
> Arkansas Railroad; thence running Southerly along
> L & A Railroad to Highway 171; thence Easterly along
> Highway 171 to its intersection with Highway 173;
> thence Southerly along Highway 173 to its intersection
> with South line of Section 13, Township 17 North,
> Range 9 West; thence East to and ending at South-
> east corner of Section 13, Township 17 North,
> Range 8 West.

Heflin Elementary Zone in Sibley Attendance Zone:

> That area of Sibley attendance zone
> lying South and West of the above
> described line.

## MINDEN SCHOOL ATTENDANCE ZONE

Begin at Northeast corner of Section 1, Township
20 North, Range 9 West, on the East boundary
of Webster Parish and run Southerly and Easterly
along parish boundary to its intersection with
North line of Section 3, Township 18 North,
Range 8 West; thence West on Section lines to
Northwest corner of Section 1, Township 18 North,
Range 9 West; thence South to Northwest corner
of S-1/2 of Section 12, Township 18 North, Range
9 West; thence West to Northeast corner of North-
west Quarter of Southwest Quarter, Section 10,
Township 18 North, Range 9 West; thence North to
North line of Section 10; thence West on section
lines to Southwest corner of Section 6, Township
18 North, Range 9 West; thence North I-20; thence
West on I-20 to its intersection with the West line
of Section 3, Township 18 North, Range 10 West;
thence North on section lines to Southeast corner
of Section 16, Township 19 North, Range 10 West;
thence Northwest to Northwest corner of Section 16,
Township 19 North, Range 10 West; thence North to
intersection with Highway 18; thence West to parish
boundary; thence North on parish boundary to North-
west corner of Section 31, Township 20 North, Range
10 West; thence East to Dorcheat Bayou; North to
Township line 21 North; thence East on Township
line to point of beginning.

### Harper Elementary Zone of Minden Attendance Zone:

Begin where Germantown Road (Highway 114) enters
Webster Parish in Section 20, Township 20 North,
Range 8 West and run Southwesterly on Germantown
Road to its intersection with Gladney Street;
thence South on Gladney to Homer Road; West on
Homer Road to Fort Street; Southerly on Fort Street
to Dennis Street; thence West on Dennis Street to
a point where an extended line of Talton Street
would intersect with Dennis Street; thence South on
this line and Talton Street to its intersection with
Plum Street; thence East on Plum Street and extension
thereof to Gibsland Road (U. S. Highway 80 East);
thence Easterly on Gibsland Road to its intersection
with Township line 19 North; thence East to the
Parish boundary; thence Northerly and Westerly
around parish boundary to point of beginning.

### Jones Elementary Zone of Minden Attendance Zone:

Begin where Township line 19 North intersects East
parish boundary; thence run West to intersection of
Gibsland Road; thence run Northwesterly along Gibsland
Road to intersection of extension of Plum Street;
thence West along this line and Plum Street to Talton;
thence North on Talton to Frazier Street; thence run
Northeasterly along Frazier, Maiden Lane and Miller
Streets to Broadway; thence run Southwesterly on
Broadway to the center line of westernmost track
of KCS Railroad; thence South on KCS Railroad to
North line of Section 9, Township 18 North, Range
9 West; thence Easterly and Southerly around South
line of Minden School Attendance Zone to East parish
boundary, the point of beginning.

24

NOTE: That area of the Doyline School Bonding District not otherwise herein described in the Doyline Attendance Zone and from which students have been attending Minden Schools for approximately 50 years is hereby zoned into the Minden School Attendance Zone and the Jones Elementary Zone thereof. This area of the Doyline School Bonding District referred to, is described as follows:

From the point of intersection of Dorcheat Bayou and south line of Section 6, Township 18 North, Range 9 West run West to SW corner of said Section 6; thence North to Interstate Highway 20; thence West on Interstate 20 to West line of Section 3, Township 18 North, Range 10 West; thence North on section lines to SE corner of Section 16, Township 19 North, Range 10 West; thence NW to the NW corner of Section 16, Township 19 North, Range 10 West; thence North to intersection with Highway 18; thence run West to parish boundary; thence run North on parish boundary to NW corner of Section 31, Township 20 North, Range 10 West; thence run East to Dorcheat Bayou; thence South on Dorcheat Bayou to point of beginning.

Stewart Elementary Zone of Minden Attendance Zone:

Begin at intersection of the KCS Railroad with South line of Minden School Attendance Zone and South line of Section 4, Township 18 North, Range 9 West; thence run North along the westernmost track of KCS Railroad to a point where an extension of Goodwill Street would intersect said railroad; thence continue North on this line and on Goodwill Street to Ash Street; thence run West on Ash Street to Constable Street; thence run North on Constable extension thereof to the North line of Section 16, Township 19 North, Range 9 West; thence run West along section line to KCS Railroad; thence run North along the KCS Railroad to Dorcheat Bayou; thence South along Dorcheat Bayou to South line of Section 5, Township 18 North, Range 9 West; thence run East to point of beginning.

Richardson Elementary Zone of Minden Attendance Zone:

Begin at intersection of the westernmost track of the KCS Railroad and Broadway; thence run NE along Broadway to intersection of Miller Street; thence run SE along Miller, Frazier and Maiden Lane to Talton Street; thence run North on Talton and extension thereof to Dennis Street; thence run NE on Dennis to Fort Street; thence North on Fort Street to Homer Road; thence run East on Homer Road to Gladney Street; thence run North on Gladney to the Germantown Road; thence run NE on Germantown Road to North line of Section 20, Township 20 North, Range 8 West; thence run Westerly and Northerly along Minden School Attendance Zone boundary to its intersection with Dorcheat Bayou at the North line of Section 1, Township 20 North, Range 10 West; thence run Southerly along Dorcheat Bayou to intersection of the KCS Railroad; thence Southwesterly along the KCS Railroad to the South line of Section 8, Township 19 North, Range 9 West; thence East on section lines to a point where a Northerly extension of Constable Street would intersect the North line of Section 16, Township 19 North, Range 9 West; thence run South on this line and Constable Street to Ash Street; West on Ash Street to Goodwill Street; thence South on Goodwill and extension thereof to a point where this line would intersect the westernmost track of the KCS Railroad; thence South on KCS Railroad to point of beginning.

## Number of Teachers and Principals (Webster Parish 1961 through 1974)

| | WHITE | | | | NEGRO | | | | | TOTAL WHITE & NEGRO | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Prin. | Men | Women | Total | Prin. | Men | Women | Total | % | Prin. | Men | Women | Total |
| 1961-62 | 15 | 70 | 221 | 306 | 10 | 34 | 110 | 154 | 33.5 | 25 | 104 | 331 | 460 |
| 1962-63 | 15 | 72 | 220 | 307 | 10 | 37 | 109 | 156 | 33.7 | 25 | 109 | 329 | 463 |
| 1963-64 | 15 | 72 | 225 | 312 | 10 | 37 | 113 | 160 | 33.9 | 25 | 109 | 338 | 472 |
| 1964-65 | 15 | 76 | 232 | 323 | 10 | 37 | 117 | 164 | 33.7 | 25 | 113 | 349 | 487 |
| 1965-66 | 15 | 74 | 237 | 326 | 10 | 39 | 121 | 170 | 34.2 | 25 | 113 | 358 | 496 |
| 1966-67 | 15 | 74 | 250 | 339 | 10 | 40 | 134 | 184 | 35.2 | 25 | 114 | 384 | 523 |
| 1967-68 | 15 | 75 | 250 | 340 | 10 | 47 | 149 | 196 | 36.6 | 25 | 122 | 389 | 536 |
| 1968-69 | 15 | 72 | 246 | 333 | 10 | 50 | 154 | 214 | 39.1 | 25 | 121 | 394 | 547 |
| 1969-70 | 15 | 74 | 241 | 330 | 9 | 47 | 153 | 209 | 38.8 | 24 | 121 | 394 | 539 |
| 1970-71 | 15 | 80 | 239 | 334 | 7 | 46 | 145 | 198 | 37.2 | 22 | 126 | 384 | 532 |
| * 1971-72 | 16 | 79 | 255 | 350 | 7 | 47 | 150 | 204 | 36.8 | 23 | 126 | 405 | 554 |
| * 1972-73 | 16 | 79 | 261 | 356 | **7 | 48 | 151 | 206 | 36.7 | 23 | 127 | 412 | 562 |
| *1973-74 | 16 | 84 | 240 | 340 | 7 | 49 | 141 | 197 | 36.7 | 23 | 133 | 381 | 537 |
| 13 year average | | | | 330.5 | | | | 185.5 | 35.9 | | | | 516 |

*Includes Federal Teachers for first time (35) 554 - 35 = 519

** Thomas & Rhone, Cullen and Clark Elem Schools Consolidated per court order 1970

Of 3 principals 1 made Supervisor
 1 retired
 1 promoted to vacancy at Central High School

None dismissed.

NOTE: Reduction in staff in 1973-74 caused by overstaffing.

WHITE

| (A) Spec Ed | Yr. | Grade 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | (B) 1-8 | 9 | 10 | 11 | 12 | (C) 9-12 | (D) KG | (E) A+B+C+D=E Total 1-12-Sp Ed |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | Registration | | | Annual Statistical Reports | | (Rounded to nearest whole number) | | | | | | | |
| 26 | 1961-62 | 593 | 620 | 576 | 580 | 582 | 600 | 606 | 651 | 4808 | 605 | 476 | 359 | 356 | 1796 | | 6630 |
| 33 | 1962-63 | 598 | 576 | 596 | 580 | 606 | 593 | 646 | 557 | 4752 | 651 | 541 | 432 | 350 | 1974 | | 6759 |
| 33 | 1963-64 | 668 | 577 | 565 | 619 | 578 | 617 | 640 | 584 | 4848 | 625 | 584 | 489 | 398 | 2096 | | 6977 |
| 54 | 1964-65 | 583 | 621 | 583 | 580 | 601 | 566 | 614 | 601 | 4749 | 599 | 538 | 514 | 462 | 2113 | | 6916 |
| 57 | 1965-66 | 610 | 555 | 620 | 586 | 563 | 605 | 607 | 597 | 4743 | 581 | 523 | 476 | 467 | 2052 | | 6852 |
| 68 | 1966-67 | 630 | 566 | 587 | 623 | 573 | 581 | 641 | 570 | 4771 | 617 | 536 | 460 | 451 | 2064 | | 6903 |
| 80 | 1967-68 | 579 | 583 | 555 | 574 | 594 | 576 | 615 | 605 | 4681 | 601 | 538 | 453 | 428 | 2020 | | 6781 |
| 61 | 1968-69 | 579 | 555 | 594 | 562 | 581 | 580 | 604 | 581 | 4636 | 661 | 496 | 457 | 411 | 2025 | | 6722 |
| 73 | 1969-70 | 519 | 547 | 549 | 580 | 552 | 585 | 603 | 571 | 4506 | 565 | 587 | 445 | 426 | 2023 | | 6602 |
| 83 | 1970-71 | 449 | 450 | 484 | 518 | 552 | 532 | 571 | 527 | 4083 | 583 | 495 | 491 | 402 | 1971 | | 6137 |
| 82 | 1971-72 | 425 | 421 | 466 | 498 | 513 | 561 | 550 | 538 | 3978 | 583 | 500 | 445 | 437 | 1965 | | 6025 |
| 91 | 1972-73 | 404 | 405 | 431 | 465 | 500 | 525 | 570 | 537 | 3837 | 606 | 510 | 433 | 409 | 1958 | 310 | 6196 |
| 89 | 1973-74 | 370 | 411 | 39 | 444 | 454 | 497 | 547 | 533 | 3653 | 556 | 520 | 438 | 404 | 1918 | 329 | 5989 |
| 830 | Totals: | 7007 | 6887 | 7001 | 7209 | 7249 | 7418 | 7820 | 7454 | 58045 | 7833 | 6849 | 5892 | 5401 | 25975 | 639 | 85489 |
| 63.8 | 13 yr. av.: | 539 | 530 | 539 | 554 | 558 | 571 | 602 | 573 | 4465 | 603 | 527 | 453 | 415 | 1998 | 320 | 6576 |

NEGRO

Registration - Annual Statistical Reports *(Rounded to nearest whole number)*

| (A) Spec Ed | Yr. | Grade 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | (B) 1-8 | 9 | 10 | 11 | 12 | (C) 9-12 | (D) KG | (E) A+B+C+D=E Total 1-12-Sp Ed |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 20 | 1961-62 | 396 | 378 | 385 | 356 | 384 | 373 | 358 | 333 | 2963 | 291 | 253 | 201 | 202 | 947 | | 3930 |
| 20 | 1962-63 | 429 | 358 | 377 | 359 | 351 | 373 | 388 | 310 | 2945 | 348 | 249 | 212 | 176 | 985 | | 3950 |
| 22 | 1963-64 | 375 | 393 | 363 | 376 | 358 | 325 | 412 | 370 | 2972 | 340 | 260 | 215 | 193 | 1008 | | 4002 |
| 21 | 1964-65 | 399 | 335 | 382 | 351 | 368 | 340 | 362 | 368 | 2905 | 375 | 276 | 247 | 194 | 1092 | | 4018 |
| 32 | 1965-66 | 409 | 379 | 332 | 363 | 343 | 377 | 335 | 337 | 2875 | 404 | 318 | 243 | 224 | 1189 | | 4096 |
| 27 | 1966-67 | 388 | 374 | 360 | 317 | 352 | 331 | 385 | 313 | 2820 | 386 | 309 | 260 | 216 | 1171 | | 4018 |
| 64 | 1967-68 | 414 | 384 | 383 | 351 | 333 | 335 | 375 | 319 | 2894 | 351 | 308 | 273 | 232 | 1164 | | 4122 |
| 57 | 1968-69 | 381 | 382 | 384 | 369 | 342 | 322 | 348 | 336 | 2864 | 388 | 255 | 246 | 258 | 1147 | | 4068 |
| 32 | 1969-70 | 396 | 341 | 398 | 361 | 354 | 347 | 332 | 348 | 2877 | 304 | 255 | 171 | 178 | 908 | | 3817 |
| 62 | 1970-71 | 427 | 363 | 360 | 375 | 352 | 350 | 336 | 281 | 2844 | 365 | 293 | 261 | 194 | 1113 | | 4019 |
| 132 | 1971-72 | 387 | 354 | 350 | 348 | 336 | 338 | 328 | 295 | 2736 | 322 | 301 | 261 | 231 | 1115 | | 3983 |
| 156 | 1972-73 | 372 | 330 | 361 | 348 | 334 | 327 | 363 | 273 | 2708 | 348 | 263 | 254 | 239 | 1104 | 193 | 4161 |
| 194 | 1973-74 | 304 | 318 | 310 | 348 | 327 | 328 | 337 | 317 | 2589 | 306 | 282 | 222 | 233 | 1043 | 200 | 4026 |
| 839 | Totals: | 5241 | 4689 | 4745 | 4622 | 4534 | 4466 | 4659 | 4200 | 36992 | 4528 | 3622 | 2066 | 2770 | 13986 | 393 | 52210 |
| 64 | 13 yr. av. | 403 | 361 | 365 | 356 | 349 | 343 | 358 | 323 | 2846 | 348 | 279 | 236 | 213 | 1076 | 197 | 4016 |

WHITE & NEGRO

Registration - Annual Statistical Reports (Rounded to nearest whole number)

| (A) Spec Ed | Yr. | Grade 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | (B) 1-8 | 9 | 10 | 11 | 12 | (C) 9-12 | (D) KG | (E) A+B+C+D=E Total 1-12-Sp Ed |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 46 | 1961-62 | 989 | 998 | 961 | 936 | 966 | 973 | 964 | 984 | 7771 | 896 | 729 | 560 | 558 | 2743 | | 10560 |
| 53 | 1962-63 | 1027 | 934 | 973 | 939 | 957 | 966 | 1034 | 867 | 7697 | 999 | 790 | 644 | 526 | 2959 | | 10709 |
| 55 | 1963-64 | 1043 | 970 | 928 | 995 | 936 | 942 | 1052 | 954 | 7820 | 965 | 844 | 704 | 591 | 3104 | | 10979 |
| 75 | 1964-65 | 982 | 956 | 965 | 931 | 969 | 906 | 976 | 969 | 7654 | 974 | 814 | 761 | 656 | 3205 | | 10934 |
| 89 | 1965-66 | 1019 | 934 | 952 | 949 | 906 | 982 | 942 | 934 | 7618 | 985 | 846 | 719 | 691 | 3241 | | 10948 |
| 95 | 1966-67 | 1018 | 940 | 947 | 940 | 925 | 912 | 1026 | 883 | 7591 | 1003 | 845 | 720 | 667 | 3235 | | 10921 |
| 144 | 1967-68 | 993 | 967 | 938 | 925 | 927 | 911 | 990 | 924 | 7575 | 952 | 846 | 726 | 660 | 3184 | | 10903 |
| 118 | 1968-69 | 960 | 937 | 978 | 931 | 923 | 902 | 952 | 917 | 7500 | 1049 | 751 | 703 | 669 | 3172 | | 10790 |
| 105 | 1969-70 | 915 | 888 | 947 | 941 | 906 | 932 | 935 | 919 | 7383 | 869 | 842 | 616 | 604 | 2931 | | 10419 |
| 145 | 1970-71 | 876 | 813 | 844 | 893 | 904 | 882 | 907 | 808 | 6927 | 948 | 788 | 752 | 596 | 3084 | | 10156 |
| 214 | 1971-72 | 812 | 775 | 816 | 846 | 849 | 899 | 884 | 833 | 6714 | 905 | 801 | 706 | 668 | 3080 | | 10008 |
| 247 | 1972-73 | 776 | 735 | 792 | 813 | 834 | 852 | 933 | 810 | 6545 | 954 | 773 | 687 | 648 | 3062 | 503 | 10357 |
| 283 | 1973-74 | 674 | 729 | 705 | 792 | 781 | 825 | 884 | 852 | 6242 | 862 | 802 | 660 | 637 | 2961 | 529 | 10015 |
| 1669 | Totals: | 12084 | 11576 | 11746 | 11831 | 11783 | 11894 | 12479 | 11654 | 95037 | 12361 | 10471 | 8958 | 8171 | 39961 | 1032 | 137699 |
| 128 | 13 yr. av. | 930 | 890 | 904 | 910 | 906 | 914 | 960 | 899 | 7311 | 951 | 805 | 689 | 628 | 3074 | 516 | 10592 |

*High School Graduates*

| | WHITE | | | NEGRO | | | TOTAL | | |
|---|---|---|---|---|---|---|---|---|---|
| | Boys | Girls | Total | Boys | Girls | Total | Boys | Girls | Total |
| 1961-62 | 168 | 171 | 339 | 100 | 87 | 187 | 268 | 258 | 526 |
| 1962-63 | 158 | 187 | 345 | 95 | 98 | 193 | 253 | 285 | 538 |
| 1963-64 | 161 | 176 | 337 | 84 | 82 | 166 | 245 | 258 | 503 |
| 1964-65 | 231 | 214 | 445 | 75 | 109 | 184 | 306 | 323 | 629 |
| 1965-66 | 227 | 224 | 451 | 86 | 120 | 206 | 313 | 344 | 657 |
| 1966-67 | 207 | 228 | 435 | 101 | 100 | 201 | 308 | 328 | 636 |
| 1967-68 | 200 | 218 | 418 | 104 | 114 | 218 | 304 | 332 | 636 |
| 1968-69 | 196 | 194 | 390 | 111 | 126 | 237 | 307 | 320 | 627 |
| 1969-70 | 229 | 193 | 422 | 89 | 95 | 184 | 318 | 288 | 606 |
| 1970-71 | 216 | 185 | 401 | 94 | 90 | 184 | 310 | 275 | 585 |
| 1971-72 | 227 | 200 | 427 | 111 | 107 | 218 | 338 | 307 | 645 |
| 1972-73 | 212 | 189 | 401 | 121 | 112 | 233 | 333 | 301 | 634 |
| 1973-74 | 179 | 219 | 398 | 105 | 122 | 277 | 284 | 341 | 625 |
| Total Graduates | 2611 | 2598 | 5209 | 1276 | 1362 | 2638 | 3887 | 3960 | 7847 |
| 13 yr. average | 201 | 200 | 401 | 98 | 105 | 203 | 299 | 305 | 604 |

| Grade Structure Now | Grade Structure Proposed | School | School Board Plan | | | Bi-Racial Plan | | | Bi-Racial Minority Plan | | | Cox-Bridges Plan | | | Present Enrollment | | | Capacity (Approximate) |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | W | B | T | W | B | T | W | B | T | W | B | T | W | B | T | |
| K-5 | K-1-2 | Browning | 278 | 144 | 422 | 255 | 149 | 404 | | | | | | | 391 | 96 | 487 | 540 |
| K-5 | 3-4 / 3-4-5 | Howell " | 214 | 133 | 347 | 341 | 199 | 540 | | | | | | | 265 | 88 | 353 | 560 |
| K-8 | 5-6 / 8-9 | Brown Jr. " | 257 | 105 | 362 | 334 | 154 | 488 | | | | | | | | 299 | 299 | 625 |
| 6-8 | 7-8 / 6-7 | Sp'hill Jr. " | 293 | 124 | 417 | 268 | 120 | 388 | | | | | | | 479 | 125 | 604 | 650 |
| 9-12 | 9-12 / 10-12 | Sp'hill High " | 612 | 227 | 839 | 470 | 151 | 621 | | | | | | | 586 | 185 | 771 | 750 |
| K-12 | K-12 | Sarepta High | 325 | 30 | 355 | 325 | 30 | 355 | | | | | | | 325 | 30 | 355 | 400 |
| K-12 | K-12 | Shongaloo High | 198 | 112 | 310 | 198 | 112 | 310 | | | | | | | 198 | 112 | 310 | 350 |
| K-12 | K-12 | Cotton Valley Hi | 304 | 183 | 487 | 296 | 173 | 469 | | | | | | | 304 | 183 | 487 | 600 |
| 6-12 | *6-12 | Doyline High | 207 | 169 | 376 | 200 | 177 | 377 | | | | | | | 207 | 169 | 376 | 600 |
| K-5 | *K-5 | Union Elem | 137 | 119 | 256 | 135 | 117 | 252 | | | | | | | 137 | 119 | 256 | 275 |
| K-12 | K-5 / K-1-2 | Dubberly | 122 | 84 | 206 | 121 | 79 | 200 | | | | | | | 159 | 21 | 180 | 350 |
| 1-12 | K-5 / 3-4-5 | Heflin " | 122 | 86 | 208 | 117 | 93 | 210 | | | | | | | 135 | 23 | 158 | 300 |
| K-12 | 6-7-8 / 9-12 | Central " | 119 | 96 | 215 | 146 | 105 | 251 | | | | | | | | 263 | 263 | 400 |
| K-12 | 9-12 / **6-7 | Sibley " | 144 | 97 | 241 | 132 | 97 | 229 | | | | | | | 210 | 84 | 294 | 400 |

* As amended

** No 8th grade given in Bi-Racial Committee Plan.

| Grade Structure Now | Grade Structure Proposed | School | School Board Plan | | | Bi-Racial Plan | | | Bi-Racial Minority Plan | | | Cox-Bridges Plan | | | Present Enrollment | | | Capacity (Approximate) |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | W | B | T | W | B | T | W | B | T | W | B | T | W | B | T | |
| K-6 | K-5 2-3 | Harper Elem (A) | 280 | 94 | 374 | 209 | 241 | 450 | K-2 & 3 224 | 141 | 365 | 279 | 79 | 358 | 340 | 59 | 399 | 425 |
| K-5 | K-5 4-5 | Jones Elem (A) " | 51 | 507 | 558 | 220 | 265 | 485 | K-2 & 4 109 | 433 | 542 | 48 | 621 | 669 | | 661 | 661 | 600 |
| K-6 | K-5 4-5 | Moore Elem (B) " | 32 | 214 | 246 | 105 | 108 | 213 | K-3 & 5 54 | 199 | 253 | (Closed) | | | 0 | 277 | 277 | 320 |
| K-6 | K-5 K-1 | Richardson Elem (A) " | 355 | 22 | 377 | 162 | 178 | 340 | K-2 &5 297 | 146 | 443 | 454 | 80 | 534 | 406 | 21 | 427 | 650 |
| K-6 | K-5 K-3 | Stewart Elem (B) " | 267 | 68 | 335 | 191 | 162 | 353 | K-3 & 4 249 | 101 | 350 | 268 | 226 | 494 | 370 | 75 | 445 | 600 |
| 6-7-8 | 6 6 | Phillips Jr. " | 170 | 198 | 368 | 186 | 201 | 387 | 202 | 163 | 365 (6-8) | 72 | 379 | 451 | 0 | 408 | 408 | 500 |
| 7-8 | 7 7 | Lowe Jr. " | 179 | 159 | 338 | 206 | 176 | 382 | 206 | 176 | 382 (7-8) | 336 | 83 | 419 | 417 | 56 | 473 | 500 |
| 9-12 | 8-9 9-12 | Webster High " | 409 | 326 | 735 | 409 | 326 | 735 | 433 | 328 | 761 | 136 | 410 | 546 | 0 | 538 | 538 | 750 |
| 9-12 | 10-12 9-12 | Minden High " | 602 | 459 | 1061 | 602 | 459 | 1061 | 535 | 413 | 948 | 669 | 199 | 868 | 775 | 67 | 842 | 1000 |

(A) Paired under Bi-Racial Plan

(b) Paired under Bi-Racial Minority Plan

WEBSTER PARISH SCHOOL BOARD

Minden, Louisiana

TEACHER-STAFF ASSIGNMENTS NEEDED TO CONTINUE A 64% WHITE AND 36% BLACK RATIO FOR ALL SCHOOLS ACCORDING TO SCHOOL BOARD PLAN FOR A UNITARY SCHOOL SYSTEM FOR 1974-75 SCHOOL YEAR

| | STAFF NUMBER ALLOTMENT | BLACK | WHITE |
|---|---|---|---|
| 1. Brown Middle School (5-6) | 16 | 6 | 10 |
| 2. Browning Elementary (K-1-2) | 19 | 7 | 12 |
| 3. Central Jr. High (6-7-8) | 12 | 4 | 8 |
| 4. Cotton Valley (K-12) | 29 | 10 | 19 |
| 5. Doyline High School (5-12) | 31 | 11 | 20 |
| 6. Dubberly Elementary (K-5) | 10 | 4 | 6 |
| 7. Heflin Elementary School (K-5) | 8 | 3 | 5 |
| 8. Harper Elementary School (K-5) | 10 | 4 | 6 |
| 9. Howell Elementary School (3-4) | 14 | 5 | 9 |
| 10. J.L. Jones Elementary (K-5) | 25 | 10 | 15 |
| 11. Lowe Junior (7) | 20 | 7 | 13 |
| 12. Minden High School (10-12) | 53 | 19 | 34 |
| 13. J. A. Moore Elementary (K-5) | 9 | 3 | 6 |
| 14. Phillips Elementary (6) | 17 | 6 | 11 |
| 15. Richardson Elementary (K-5) | 15 | 5 | 10 |
| 16. Sarepta High School (K-12) | 21 | 8 | 13 |
| 17. Shongaloo High School (K-12) | 20 | 7 | 13 |
| 18. Sibley High School (9-12) | 16 | 6 | 10 |
| 19. Springhill High School (9-12) | 44 | 16 | 28 |
| 20. Springhill Junior High (7-8) | 20 | 7 | 13 |
| 21. Stewart Elementary School (K-5) | 14 | 5 | 9 |
| 22. Union Elementary School (K-4) | 10 | 4 | 6 |
| 23. Webster High School (8-9) | 37 | 13 | 24 |

Teachers will be assigned according to the "Criteria For Teacher Transfer" adopted by the Webster Parish School Board on April 1, 1974.

The above Staff allotment of Teachers and Staff members are made according to the 1973-74 Louisiana State Department of Education schedule for allotting teachers. They will vary according to student enrollment.

## PROCEDURE FOR TRANSFER

All principals will follow the procedural steps as outlined below applying numbers one, two, and three of the criteria to be used to transfer teachers. Each principal will turn in a list even though he believes other criteria may prevent a teacher or teachers to be transferred from his school. The only exception to this will be the principal who already has established a sixty-four percent white and thirty-six percent black ratio of teachers in his school.

1. The Personnel Department will send criteria for selection, as indicated, to each school along with a copy of the faculty roster. This roster should indicate the number of teachers to be moved to achieve the ratio.

2. The principal will return to the Central Office the roster along with the list of teachers who are subject to transfer according to the prescribed selection criteria. The list will show the subjects taught, subjects ceritfied to teach and the grade level for each person.

3. The Personnel Department and Supervisors will verify the lists and return them to the principals with transfer forms.

WEBSTER PARISH SCHOOL BOARD
MINDEN, LOUISIANA
March 13, 1974

### Criteria To Be Used To Transfer Teachers

The Webster Parish School Board has been ordered by the Fifth Circuit Court of Appeals to assign teachers so that the ratio of white to black teachers in each school will be sixty-four percent (64%) white to thirty-six (36%) percent black.

In compliance with the above mandate, teachers and other staff working directly with children will be required to accept new assignments as a condition of continued employment.

The following criteria will be used to implement the above order:

1. Volunteers – Teachers will be encouraged to volunteer to accept assignments in schools where their race was previously in the minority.

2. Teachers considered first for transfer, after volunteers, will be selected according to their continuous years of service in Webster Parish Schools depending on the needs in subject or grade positions. The last teacher to be hired in a school will be considered first for transfer except as indicated in number 4 of these criteria. ( An official leave granted a teacher by the School Board does not break her years of continuous service).

3. Teachers presently teaching in a school where their race is in the minority will not be transferred unless the grade or subject in which they are teaching is moved to another facility or an overbalance occurs in a grade or subject.

4. When a transfer results in the elimination of a program because a reciprocal transfer is not possible, the teacher will be retained in the school.

5. Teachers will be re-assigned in their fields of certification when transferred, except as indicated - number 8.

6. Proximity to place of residence will not determine re-assignment, but will be considered.

7. When the consolidation or re-organization of schools in a community is required, teacher re-assignments will be made in terms of the criteria listed above, but in some situations re-assignments will be made in terms of the best overall educational programs for the schools involved. The Supervisory staff will consult with the principals involved in cases where such re-organization or consolidation is ordered by the court.

8. When consolidation or re-organization of schools results in the elimination of a teaching position, the teachers affected will be placed in teaching positions which most nearly meets their certification.

9. When consolidation or re-organization of schools results in grade changes, teachers involved will move to that school with his grade level or subject matter area insofar as is possible to bring about the proper ratio of black and white teachers in that school.

10. In cases where seniority in the system is identical at an individual school, and only one of the teachers will be required to move, the person with the greater total experience or earlier birthdate (in that order) shall be the person to remain.

11. The Personnel Department and Supervisory Staff will effect transfers and re-assignments.

Suspension – Expulsion Report

(September 1, 1972–February 1,1973)

| School | Suspensions B | W | Expulsions B | W |
|---|---|---|---|---|
| Cotton Valley | 37 | 8 | 0 | 0 |
| Dubberly | 0 | 3 | 0 | 0 |
| Doyline | 34 | 31 | 0 | 0 |
| Sarepta | 0 | 3 | 0 | 0 |
| Shongaloo | 8 | 6 | 0 | 0 |
| Sibley | 2 | 6 | 0 | 0 |
| Springhill High | 69 | 78 | 0 | 0 |
| Webster High | 4 | 0 | 0 | 0 |
| Minden High | 10 | 137 | 0 | 5 |
| Central High | 1 | 0 | 0 | 0 |
| Heflin High | 0 | 2 | 0 | 0 |
| Brown Jr. High | 0 | 0 | 0 | 0 |
| Lowe Jr. High | 0 | 13 | 0 | 0 |
| Springhill Jr. High | 30 | 27 | 0 | 0 |
| Phillips Jr. High | 2 | 0 | 0 | 0 |
| Total | 197 | 314 | 0 | 5 |

| WHITE | Cotton Valley | Dubberly | Doyline | Sarepta | Shongaloo | Sibley | Springhill High | Webster | Minden High | Central High | Springhill Jr. Hi | Phillips | Heflin High | Lowe Jr. High | Brown Jr. High | Total | Elementary |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| DISOBEDIENCE | 2 | 0 | 0 | 1 | 3 | 0 | 4 | 0 | 1 | 0 | 1 | 0 | 0 | 8 | 0 | 17 | |
| MORAL CONDUCT | 0 | 0 | 0 | 0 | 2 | 0 | 4 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 0 | 7 | |
| HABITUAL VIOLATION OF SCHOOL RULES | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | |
| USE OF PROFANE LANGUAGE | 0 | 0 | 0 | 0 | 1 | 1 | 0 | 0 | 2 | 0 | 0 | 0 | 0 | 1 | 0 | 5 | |
| FIGHTING | 1 | 0 | 7 | 1 | 2 | 7 | 0 | 0 | 2 | 0 | 11 | 0 | 0 | 9 | 0 | 40 | |
| DISRESPECT TO SCHOOL OFFICIALS | 1 | 0 | 6 | 3 | 5 | 2 | 6 | 0 | 2 | 0 | 0 | 0 | 0 | 1 | 0 | 25 | |
| USE OF TOBACCO/ALCOHOL/NARCOTICS | 1 | 0 | 22 | 1 | 3 | 1 | 2 | 0 | 25 | 0 | 3 | 0 | 0 | 3 | 0 | 61 | |
| DESTRUCTION OF SCHOOL PROPERTY | 0 | 0 | 1 | 1 | 1 | 0 | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 1 | 0 | 5 | |
| UNACCEPTED DRESS/HAIR. ETC. | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | |
| POSSESSION OF KNIVES/FIREARMS | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | |
| HABITUALLY TARDY/ABSENT | 0 | 0 | 0 | 4 | 0 | 0 | 35 | 0 | 2 | 0 | 3 | 0 | 0 | 0 | 0 | 44 | |
| SKIPPING CLASS/LEAVING SCHOOL OR CLASS W/O PERMISSION | 4 | 0 | 7 | 3 | 1 | 5 | 44 | 0 | 78 | 0 | 4 | 0 | 0 | 4 | 0 | 150 | |
| HABITUAL CLASS DISTURBANCE | 0 | 0 | 1 | 1 | 0 | 0 | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 3 | |
| STEALING | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | |
| OTHER | 2 | 0 | 4 | 0 | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 0 | 8 | |
| TOTAL SUSPENSIONS | 11 | 0 | 48 | 15 | 15 | 11 | 103 | 0 | 106 | 0 | 22 | 0 | 0 | 29 | 0 | 360 | |
| FIRST | 9 | 0 | 28 | 11 | 12 | 7 | 67 | 0 | 70 | 0 | 22 | 0 | 0 | 29 | 0 | 218 | |
| SECOND | 2 | 0 | 14 | 2 | 1 | 2 | 22 | 0 | 17 | 0 | 0 | 0 | 0 | 0 | 0 | 60 | |
| THIRD | 0 | 0 | 5 | 1 | 1 | 2 | 6 | 0 | 16 | 0 | 0 | 0 | 0 | 0 | 0 | 31 | |
| EXPELLED | 0 | 0 | 0 | 0 | 1 | 0 | 1 | 0 | 3 | 0 | 0 | 0 | 0 | 0 | 0 | 5 | |
| INDEFINITE | 0 | 0 | 1 | 1 | 2 | 0 | 7 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 11 | |

FROM SEPT. - MAY, 1974

| BLACK | Cotton Valley | Dubberly | Doyline | Sarepta | Shongaloo | Sibley | Springhill High | Webster | Minden High | Central High | Springhill Jr. Hi | Phillips | Heflin High | Lowe Jr. High | Brown Jr. High | Total | Elementary |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| DISOBEDIENCE | 3 | 0 | 0 | 0 | 0 | 0 | 2 | 2 | 1 | 0 | 5 | 2 | 0 | 1 | 0 | 16 | |
| MORAL CONDUCT | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 0 | 0 | 1 | 0 | 2 | |
| HABITUAL VIOLATION OF SCHOOL RULES | 0 | 2 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 2 | 0 | 5 | 1 |
| USE OF PROFANE LANGUAGE | 1 | 0 | 1 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 0 | 4 | |
| FIGHTING | 6 | 4 | 14 | 0 | 2 | 0 | 12 | 0 | 0 | 0 | 9 | 1 | 0 | 2 | 0 | 50 | |
| DISRESPECT TO SCHOOL OFFICIALS | 9 | 0 | 7 | 0 | 1 | 0 | 4 | 2 | 1 | 4 | 0 | 1 | 0 | 1 | 0 | 29 | |
| USE OF TOBACCO/ALCOHOL/NARCOTICS | 1 | 0 | 9 | 0 | 0 | 0 | 3 | 0 | 8 | 0 | 1 | 0 | 0 | 0 | 0 | 22 | |
| DESTRUCTION OF SCHOOL PROPERTY | 0 | 0 | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | |
| UNACCEPTED DRESS/HAIR. ETC. | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | |
| POSSESSION OF KNIVES/FIREARMS | 0 | 0 | 0 | 0 | 0 | 0 | 3 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 3 | |
| HABITUALLY TARDY/ABSENT | 0 | 0 | 1 | 0 | 0 | 0 | 50 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 51 | |
| SKIPPING CLASS/LEAVING SCHOOL OR CLASS W/O PERMISSION | 3 | 2 | 7 | 0 | 0 | 0 | 25 | 1 | 6 | 0 | 2 | 0 | 0 | 1 | 0 | 47 | |
| HABITUAL CLASS DISTURBANCE | 1 | 0 | 0 | 0 | 0 | 0 | 6 | 0 | 0 | 0 | 2 | 0 | 0 | 0 | 0 | 9 | |
| STEALING | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | |
| OTHER | 1 | 0 | 9 | 0 | 0 | 0 | 3 | 0 | 1 | 0 | 0 | 0 | 0 | 1 | 0 | 15 | |
| TOTAL SUSPENSIONS | 25 | 8 | 49 | 0 | 5 | 0 | 106 | 5 | 14 | 0 | 17 | 4 | 0 | 7 | 0 | 216 | |
| FIRST | 17 | 8 | 27 | 0 | 5 | 0 | 59 | 5 | 5 | 0 | 0 | 2 | 0 | 2 | 0 | 112 | |
| SECOND | 7 | 0 | 12 | 0 | 0 | 0 | 39 | 0 | 10 | 0 | 2 | 1 | 0 | 1 | 0 | 72 | |
| THIRD | 1 | 0 | 4 | 0 | 0 | 0 | 5 | 0 | 2 | 0 | 0 | 0 | 0 | 0 | 0 | 12 | |
| EXPELLED | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | |
| INDEFINITE | 0 | 0 | 5 | 0 | 0 | 0 | 5 | 0 | 0 | 0 | 0 | 1 | 0 | 0 | 0 | 11 | |

FROM SEPT. - MAY, 1974

MAP

### CITY OF MINDEN

COMPLIMENTS

### PEOPLES BANK & TR

*Your Friendly Bank*

Minden Schools Attendance Zone

| Grade Structure Now | Grade Structure Proposed | School | School Board Plan | | | Bi-Racial Plan | | | Bi-Racial Minority Plan | | | Cox-Bridges Plan | | | Present Enrollment | | | Court Plan | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | W | B | T | W | B | T | W | B | T | W | B | T | W | B | T | W | B | T |
| K-5 | K-1-2 | Browning | 278 | 144 | 422 | 255 | 149 | 404 | | | | | | | 391 | 96 | 487 | 278 | 144 | 422 |
| K-5 | 3-4 / 3-4-5 | Howell " | 214 | 133 | 347 | 341 | 199 | 540 | | | | | | | 265 | 88 | 353 | 214 | 133 | 347 |
| K-8 | 5-6 / 8-9 | Brown Jr. " | 257 | 105 | 362 | 334 | 154 | 488 | | | | | | | | 299 | 299 | 257 | 105 | 362 |
| 6-8 | 7-8 / 6-7 | Sp'hill Jr. " | 293 | 124 | 417 | 268 | 120 | 388 | | | | | | | 479 | 125 | 604 | 293 | 124 | 417 |
| 9-12 | 9-12 / 10-12 | Sp'hill High " | 612 | 227 | 839 | 470 | 151 | 621 | | | | | | | 586 | 185 | .771 | 612 | 227 | 839 |
| K-12 | K-12 | Sarepta High | 325 | 30 | 355 | 325 | 30 | 355 | | | | | | | 325 | 30 | 355 | 325 | 30 | 355 |
| K-12 | K-12 | Shongaloo High | 198 | 112 | 310 | 198 | 112 | 310 | | | | | | | 198 | 112 | 310 | 198 | 112 | 310 |
| K-12 | K-12 | Cotton Valley Hi | 304 | 183 | 487 | 296 | 173 | 469 | | | | | | | 304 | 183 | 487 | 304 | 183 | 487 |
| 6-12 | *6-12 | Doyline High | 207 | 169 | 376 | 200 | 177 | 377 | | | | | | | 207 | 169 | 376 | 207 | 169 | 376 |
| K-5 | *K-5 | Union Elem | 137 | 119 | 256 | 135 | 117 | 252 | | | | | | | 137 | 119 | 256 | 137 | 119 | 256 |
| K-12 | K-5 / K-1-2 | Dubberly " | 122 | 84 | 206 | 121 | 79 | 200 | | | | | | | 159 | 21 | 180 | 122 | 84 | 206 |
| 1-12 | K-5 / 3-4-5 | Heffin " | 122 | 86 | 208 | 117 | 93 | 210 | | | | | | | 135 | 23 | 158 | 122 | 86 | 208 |
| K-12 | 6-7-8 / 9-12 | Central " | 119 | 96 | 215 | 146 | 105 | 251 | | | | | | | | 263 | 263 | 119 | 96 | 215 |
| K-12 | 9-12 / **6-7 | Sibley. | 144 | 97 | 241 | 132 | 97 | 229 | | | | | | | 210 | 84 | 294 | 144 | 97 | 241 |

\* As amended
\*\* No 8th grade given in Bi-Racial Committee Plan.

| Grade Structure Now | Grade Structure Proposed | School | School Board Plan | | | Bi-Racial Plan | | | Bi-Racial Minority Plan | | | | Cox-Bridges Plan | | | Present Enrollment | | | Court Plan | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | W | B | T | W | B | T | W | | B | T | W | B | T | W | B | T | W | B | T |
| K-6 | K-5 / 2-3 | Harper Elem (A) | 280 | 94 | 374 | 209 | 241 | 450 | K-2 & 3 | 224 | 141 | 365 | 279 | 79 | 358 | 340 | 59 | 399 | 280 | 171 | 451 |
| K-5 | K-5 / 4-5 | Jones Elem (A) " | 51 | 507 | 558 | 220 | 265 | 485 | K-2 & 4 | 109 | 433 | 542 | 48 | 621 | 669 | | 661 | 661 | 146 | 368 | 504 |
| K-6 | K-5 / 4-5 | Moore Elem (B) " | 32 | 214 | 246 | 105 | 108 | 213 | K-3 & 5 | 54 | 199 | 253 | | (Closed) | | 0 | 277 | 277 | | (CLOSE) | |
| K-6 | K-5 / K-1 | Richardson Elem (A) " | 355 | 22 | 377 | 162 | 178 | 340 | K-2 &5 | 297 | 146 | 443 | 454 | 80 | 534 | 406 | 21 | 427 | 355 | 95 | 450 |
| K-6 | K-5 / K-3 | Stewart Elem (B) " | 267 | 68 | 335 | 191 | 162 | 353 | K-3 & 4 | 249 | 101 | 350 | 268 | 226 | 494 | 370 | 75 | 445 | 264 | 271 | 535 |
| 6-7-8 | 6 / 6 | Phillips Jr. " | 170 | 198 | 368 | 186 | 201 | 387 | (6-8) | 202 | 163 | 365 | 72 | 379 | 451 | 0 | 408 | 408 | 170 | 198 | 368 |
| 7-8 | 7 / 7 | Lowe Jr. " | 179 | 159 | 338 | 206 | 176 | 382 | (7-8) | 206 | 176 | 382 | 336 | 83 | 419 | 417 | 56 | 473 | 179 | 159 | 338 |
| 9-12 | 8-9 / 9-12 | Webster High " | 409 | 326 | 735 | 409 | 326 | 735 | | 433 | 328 | 761 | 136 | 410 | 546 | 0 | 538 | 538 | 409 | 326 | 735 |
| 9-12 | 10-12 / 9-12 | Minden High " | 602 | 459 | 1061 | 602 | 459 | 1061 | | 535 | 413 | 948 | 669 | 199 | 868 | 775 | 67 | 842 | 602 | 459 | 1061 |

(A) Paired under Bi-Racial Plan

(b) Paired under Bi-Racial Minority Plan